[Civ. No. 6639. Fourth Dist. Apr. 30, 1962.]

PASQUALE CORDASCO, Plaintiff and Respondent, v. ROSIE SCALERO, Individually and as Executrix, etc., et al., Defendants and Appellants.

Barry Sullivan and Harry V. Leppek for Defendants and Appellants.

Robert J. Bowman for Plaintiff and Respondent.

GRIFFIN, P. J.—Plaintiff, cross-defendant and respondent, Pasquale Cordasco (hereinafter referred to as plaintiff), brought this action against Rosie Scalero, executrix of the Estate of Mary Cordasco, deceased, Lucia Winters, Florence Oliver, Nettie Farrante, Agosta Ronzo and Rosie Scalero, defendants, cross-complainants and appellants (hereinafter referred to as defendants), alleging that Mary Cordasco died on May 14, 1958; that Rosie Scalero was appointed executrix of her estate on July 11, 1958; that Mary and plaintiff were married in 1939; that Pasquale had four sons and one daughter by a previous marriage and Mary had five daughters by a previous marriage; that plaintiff, prior to his marriage to Mary, owned and operated as his separate property agricultural land in San Bernardino County of the approximate value of $50,000; that Mary owned no real or personal property at that time; that in 1956 plaintiff received a $10,022.75 check for the sale of grapes and they deposited the proceeds in a joint savings account in the Pomona First Federal Savings and Loan Association (hereinafter referred to as First Federal) in the name of plaintiff and Mary Cordasco on December 4, 1956; that in 1957 plaintiff disposed of a majority of his separate real property; that these additional amounts were deposited from the sale of real property acquired by plaintiff prior to said marriage to decedent and that on May 14, 1958, the date of her death, there was a balance of $35,903.46 in the savings account.

It was alleged that plaintiff spoke no language except Italian and did not know how to write or sign his name except by a cross; that Mary did speak English and Italian and knew how to write, and accordingly a close confidential relationship did exist during their 19 years of married life, and particularly in relation to business affairs. (It appears that they did have a joint-tenancy savings account in a bank in Ontario.)

It was then alleged that on December 4, 1956, they went to Pomona with their son Sam Carlos and opened a savings account at First Federal because it paid more interest and an initial deposit of $10,022.75 was made. This sum was the return from the sale of grapes to the winery that year. The principal question here presented is the nature of the account as created in First Federal.

Defendants contend that the account was a tenancy in common and plaintiff insists that it was a joint-tenancy account. It also appears that Mary made a will on February 2,

1950, leaving all her property to her daughters by a previous marriage. After Mary's death, defendant executrix filed the will for probate and a notice of probate was sent to plaintiff. Plaintiff then went to First Federal to withdraw the full amount of the savings, since he believed a joint-tenancy account existed. After receiving a release from the state inheritance tax appraiser, he was allowed by First Federal to withdraw one-half of the amount, or $17,951.73, and he deposited this amount in another account in First Federal. A similar amount was retained in the account, which the executrix claimed.

Plaintiff commenced this action against First Federal and the named defendants seeking title to that one-half remaining and for an order for the return thereof to plaintiff.

Defendants, by answer, denied generally these allegations and filed a cross-complaint against plaintiff and First Federal, claiming ownership of the $17,951.73, and sought to quiet title to said money. In answer thereto, First Federal admitted holding that sum in said account (number S33184) pending determination of this litigation and offered to deposit said sum in court. It was stipulated by all parties that First Federal be designated a stakeholder of the fund and that it would pay the amount over to the parties entitled thereto when judgment became final.

### EVIDENCE

The evidence in reference to the opening of the account in First Federal is somewhat conflicting and uncertain. It is the testimony of plaintiff, testifying through an interpreter, that he relied and depended upon his wife and his son Sam Carlos as his interpreters and advisors and that he trusted his wife implicitly until his discovery, after her death, that he could not withdraw the full amount of money deposited in the First Federal account; that he and his wife previously had a joint tenancy account in the Ontario bank and each had the full privilege of withdrawal from it; that he understood that in case of his death the money would go to his wife and in case of her death it would come to him; that he told his wife, his son, and the banker (through his wife and son as interpreters) that he wanted the account in First Federal to be the same as the account in the Ontario bank and he supposed this was done; that when the account in First Federal was opened they were all three present and together with a Mr. Hield, vice president of First Federal; that Hield said

something to them about how they wanted the account opened and plaintiff told them, in Italian, that he didn't understand much about it or the difference between joint tenancy, tenancy in common or community property, but that he wanted the account opened the same as the former account and he "went along with what she said." Plaintiff testified that he had never previously discussed with his wife anything about it and had never talked of their community property.

Defendants then offered in evidence several deeds of real property signed by plaintiff (by cross) and also signed by his wife. Plaintiff testified that the real property may have been held in their names as community property rather than the separate property of plaintiff and that title to the property was changed from joint tenancy to tenancy in common. He also testified that he and his wife had a safe deposit box in Ontario and either party had access to it.

Plaintiff's son Sam testified that when plaintiff and Mary were married, his father owned about 33 acres of vineyard land; that plaintiff's sons assisted him in the farming of the land; that the day before they opened the First Federal account, the three of them talked over the question of depositing the receipts from the winery and concluded that they would take the check and open an account with First Federal, because more interest was paid there than at the Ontario bank; that on December 4, they went to First Federal and on the way both plaintiff and Mary agreed to open the account the same way as it was held in the Ontario bank; that he told Mr. Hield at First Federal that they wanted to deposit the check; that Hield explained the several ways the account could be opened and plaintiff kept saying: "The same way over there," and that he told his father "All right"; that he and his stepmother told Mr. Hield to open it the same way and they both explained to plaintiff what was taking place. Plaintiff's exhibit one, a signature card, was obtained by Hield and filled out by him on a typewriter. The testimony is that this form was ordinarily used for a joint-tenancy account. The signature card reads in part:

"TENANTS IN COMMON***** [in red ink]

Account No. S33184

(b) Membership of joint holders (with right of survivorship) of a share account.

(1) CORDASCO, PASQUALE
 (To be typed)

(2) Cordasco, Mary

> The undersigned hereby apply for a membership and a Savings share account in the
>
> Pomona First Federal Savings and Loan Association
> and for the issuance of evidence of membership in the approved form in the joint names of the undersigned *as joint tenants with the right of survivorship and not as tenants in common.* . . .

| Mary Cordasco [signed] | His X Mark | Witness—Sam Cordasco |
|---|---|---|
| (1) Signature | (2) Signature | (3) Signature |
| 2261 South Euclid Ave. | Same | 238 E. Maple St., Ont. |
| Ontario, California | | Witness—Mary Cordasco |
| | | 2261 S. Euclid Ave." |

(Italics ours.)

Sam Cordasco testified that it was signed with a cross by plaintiff, witnessed by Sam, and also signed by Mary, and then handed to Hield who gave it to a secretary who typed something on it. He testified then that before the secretary typed something on it it was all filled out by a typewriter except the words "Tenants in Common," typewritten in red ink across the top. He further testified that when the passbook was made out, the certificate was made to Pasquale Cordasco "*or*" Mary Cordasco, and this was subsequently changed to Pasquale Cordasco "*and*" Mary Cordasco, and that the words "Tenants in Common," typewritten in red ink on the passbook, were not there when plaintiff signed it, and that he did not notice it there until after Mary died; that Mary had the passbook most of the time in her possession or in their safe deposit box. He then stated that as far as he knew his father never learned that Mary had made a will until after her death. He testified that he went with Mary on occasions to withdraw money from First Federal to deposit in the joint savings account in the Ontario bank so they could pay for wages and miscellaneous items, because they had no checking account and never paid by check. He said he waited outside while she withdrew the money. The passbook shows such a withdrawal of $2,500 on March 13, 1958, as claimed by him. Mary's health at that time was quite poor and she was under a doctor's care.

On the return home, after opening the account in the first place, Sam testified that plaintiff asked both him and Mary

if the account had been opened as it was done in the Ontario bank, and that both he and Mary assured plaintiff that it had been done that way, and a few days later plaintiff again asked both of them if it was done that way because that was the best way since neither had a will. No reply by Mary is indicated.

Plaintiff produced an examiner of questioned documents who testified that he examined the signature card, ledger card and passbook and certificate (exhibit one, two and nine), on each of which was typewritten in red ink, "TENANTS IN COMMON." The examiner said he was of the opinion that the red typing had been typed at a different time from the other typing on each of the documents; that the word "or" between the two names on these exhibits had been erased and that the word "and" had been written over it.

Mr. Hield, vice president of First Federal, testified generally in reference to this transaction and said that he remembered the parties' coming in with the son and that they asked to open an account; that Mary stated that her husband did not speak or write English and that she told him in English what they wanted and she would interpret to plaintiff what he said; that he did not remember the exact conversation in reference to the type of account, but that the company usually explained to the customer the distinction and followed their wishes; that he made up the account for them, in part, but that he could not honestly state whether it was later changed; that First Federal would not have placed the words "TENANTS IN COMMON" on the card or exhibits without instructions from the depositor. He testified that when an account is opened and the depositors request it to be a "tenants in common" account, the words "TENANTS IN COMMON" are placed on the three documents indicated; that when a joint-tenancy account is indicated, a separate rubber stamp is imposed on the passbook and certificate showing it to be a joint-tenancy account with right of survivorship and not as tenants in common; that no such stamp was placed on this passbook; that the passbook was given to the depositor in the condition in which it was opened and that was done in the instant case and no objections were made thereafter in reference to the account until after the death of plaintiff's wife. He then stated that the word "or" had been changed to "and" because at times some people want to show that both signatures are required for withdrawals. He said that "or" was used when one person is authorized to withdraw funds.

However, he could not tell the reason for the change in the instant case because he did not remember. He then testified that before any change in any account from joint tenancy to tenants in common was made, he would require that both parties be present and consent to the change. He then stated that after Mary's death, plaintiff appeared at First Federal and requested the withdrawal of all the funds and said that the consent of the state inheritance tax appraiser to withdraw one-half of it was granted, on the theory of tenancy in common, and that one-half was transferred to a new account opened by plaintiff and the balance remained in the former account.

In defense, defendant Rosie Scalero testified that plaintiff told her, in the presence of others, including Sam, that they had sold some land and had put the money in the Pomona bank and that her mother said, "Yes, we put it in the bank and if anything happens to [me], my half goes to my children and his half goes to his children," and that plaintiff said, "That's right."

Upon this evidence, the court found generally that plaintiff owned, as his separate property, at the time of the marriage, real estate valued at $6,000 and that decedent owned no property; that on February 2, 1950, Mary made a will and plaintiff did not learn of it until after her death; that on December 4, 1956, plaintiff and Mary opened a joint tenancy savings account (number S33184) in First Federal; that the form of said account was never thereafter changed with the consent and knowledge of plaintiff; that defendants have no right or interest in the balance remaining in said account; and that plaintiff, since May 14, 1958, is the owner of it and entitled to possession. Judgment was entered accordingly.

On this appeal, defendants contend that, as a matter of fact or law, a joint tenancy account was never created or established; that the truth of the facts recited in the investment certificate are deemed conclusive and that the findings of the court in this respect are not supported by the evidence. Objection is also made because the court failed to find on other material issues raised by the pleadings and the evidence. Civil Code, section 1565, provides that the consent of the parties to a contract must be free, mutual and communicated by each to the other. Civil Code, section 1580, states that consent is not mutual unless the parties all agree upon the same thing in the same sense. Civil Code, section 683, provides that a joint tenancy in personal property may be created by a writ-

ten transfer, instrument or agreement, and that the provisions of this section shall not restrict the creation of a joint tenancy in a bank deposit as provided for in the Bank Act (Fin. Code, § 852). It provides that: "When a deposit is made in a bank in the names of two or more persons, . . . in such form that the moneys in the account are payable to the survivor or survivors then such deposit and all additions thereto shall be the property of such persons as joint tenants."

This Act is applicable to banks and not to building and loan associations, under Financial Code, section 6550. (*Estate of Dean*, 68 Cal.App.2d 86 [155 P.2d 901].)

Under the holding in *Berl* v. *Rosenberg*, 169 Cal. App.2d 125 [336 P.2d 975], an intent to create a joint tenancy must be specifically set forth in the instrument creating it. See also Civil Code, section 683. In *Estate of Dean, supra,* 68 Cal.App.2d 86, it was held that the mere placing of the words "Joint Tenants . . . One signature required—Right of survivorship" on the joint signature card in reference to a safe deposit box, was insufficient to show a joint tenancy of the *contents of the box* and that extrinsic evidence was admissible to show true intention of parties since the writing on the card was uncertain and ambiguous. In *Crocker-Anglo Nat. Bank* v. *American Trust Co.*, 170 Cal.App.2d 289 [338 P.2d 617], it was held that no joint tenancy bank account was shown. There was evidence of conversations of the deceased prior to the opening of the account to the effect that deceased intended it to be a joint-tenancy account. The court held that there must be a clear, *written declaration of joint tenancy* under Civil Code, section 683, and said that in the case of *California Trust Co.* v. *Bennett*, 33 Cal.2d 694 [204 P.2d 324], the contention was made that decedent's declaration and the surrounding circumstances about renting the safe deposit box were insufficient to satisfy the statutory requirement of a writing, and where a statute requires the formality of a writing for the creation of an interest in property, it must contain words indicating an intent to transfer such interest, and in the absence of words which could be interpreted to show such intent, no parol evidence will be admitted to amplify the terms of the written instrument so as to create a joint tenancy. To the same effect is *Denigan* v. *Hibernia etc. Society*, 127 Cal. 137 [59 P. 389], where money was deposited in a bank and the passbook was issued in the name of the husband "*or*" wife. The court said this form was entirely consistent with a desire on the part of the wife to

give her husband authority to withdraw money from the bank and by the use of these words it should not be held that she intended to part with her title thereto by reason of any ambiguous phrase. There was no rubber stamp placed on the signature card "Joint tenancy with the right of survivorship." *Young* v. *Young*, 126 Cal.App. 306 [14 P.2d 580], discusses the amendment of Civil Code, section 683, in 1935, requiring that the creation of a joint tenancy must be in writing, with the possible exception of a joint tenancy under a bank account.

 The burden of establishing a joint tenancy is upon the person claiming it. (*Crocker-Anglo Nat. Bank* v. *American Trust Co., supra,* 170 Cal.App.2d 289, 299.) Financial Code, division 2, part 1, chapter 7, article 4, clearly distinguishes an investment certificate from a bank account.

 The certificate in the instant case is labeled "TENANTS IN COMMON." There is nothing in that certificate itself which shows any *written* agreement between the parties that the parties agreed to hold the certificate in joint tenancy with the right of survivorship and not as tenants in common. However, the application and signature card definitely shows a written agreement between the parties that the evidence of membership shall issue in the joint names of the undersigned "as joint tenants with the right of survivorship and not as tenants in common." There appears to be no cancellation or modification of this form of agreement. The only possible exception is the placement by someone at some time of the typewritten words in red ink "TENANTS IN COMMON" at the top of the card, with no obliteration of the other provisions. The parol evidence produced as well indicates that the parties believed and intended that such a joint tenancy account was opened. These instruments, including the certificate issued, considered as a whole with the testimony produced, were sufficient to constitute a *written agreement* creating a joint tenancy. A finding that such a joint tenancy was created in writing is supported by the evidence. Whether there were changes made in respect to the nature of the account after it was opened is not clear. The court's finding on the subject is somewhat ambiguous. It found that the account was "never thereafter changed with the consent and knowledge of the Plaintiff Pasquale Cordasco." By inference, the court found that the account was thereafter changed from its original joint-tenancy nature, but without the consent and knowledge of the plaintiff. The evidence is susceptible of this interpreta-

tion. The finding that a joint tenancy originally existed and presently exists has evidentiary support. Although the evidence is capable of a contrary interpretation, under the circumstances we are bound by the familiar rule. (*Brewer* v. *Simpson*, 53 Cal.2d 567, 583 [2 Cal.Rptr. 609, 349 P.2d 289].)

In support of the judgment, plaintiff also relies upon the general rule that where community personal property or any other personal property, no matter what its original form might have been, has been changed by the parties to joint ownership during the joint lives of the owners, the funds so changed to joint tenancy, or any property acquired from the funds held in joint tenancy, will remain joint tenancy in character, unless there has been a change in the character of the property by some agreement between the parties. See *Estate of Harris*, 169 Cal. 725 [147 P. 967] ; *Estate of Harris*, 9 Cal.2d 649 [72 P.2d 873] ; *Estate of McCoin*, 9 Cal.App.2d 480 [50 P.2d 114] ; *Wallace* v. *Riley*, 23 Cal.App.2d 654 [74 P.2d 807]. In *Estate of McCoin, supra,* the husband and wife took certain funds and deposited them in a joint account. Thereafter, while both parties were living, the husband, without the wife's knowledge or consent, withdrew the funds and deposited them in a separate account in his individual name. The wife died and the court found that the joint tenancy had not been severed for the reason that there was never an agreement between the parties to alter the character of the joint account. Plaintiff argues that since the funds in the instant case were taken from the joint-tenancy bank account in Ontario and deposited in this account, the character of the property was not changed. Apparently, the trial judge gave some recognition to this claim, for he said in his written opinion:

"However, as far as the records before me are involved, it would appear that both the real property and bank funds were in joint tenancy.

"The real property was changed from joint tenancy to community property about two years later, i.e., February 20, 1952. The savings account opened in the Bank of America on August 17, 1940, was in joint tenancy and remained so until it was closed out in 1958.

"*Most, if not all, of the initial funds in the disputed account came from the Bank of America account just mentioned.*" (Italics ours.)

The nature of the real property, and whether it was community property at the time it was sold, is problematical.

The money received from the sale of that property was to a great extent first placed in the joint-tenancy bank account in Ontario. The first check deposited to the instant account was from earnings from the grape crop for the year and was never deposited in the joint savings account in the bank. It appears that the judgment declaring the money remaining and the certificate of interest in the First Federal account to be held in joint tenancy and that plaintiff was entitled to the entire proceeds of the account must be affirmed. Since decedent left a will, the extent and nature of any other property should be determined and distributed under Probate Code, section 201.5.

### FINDINGS

■ The defendants argue that the finding that on December 4, 1956, plaintiff and his wife Mary "opened a joint tenancy savings account #33184 in the . . . First Federal . . ." and that the "form of said account was never thereafter changed with the consent and knowledge of the Plaintiff . . ." was an insufficient finding on the evidence and issues presented, mainly because it infers that there was a change, but the court did not find in what respect it was changed or when, where and by whom it was changed; that the court failed to find that there was an agreement in writing creating the joint tenancy under Civil Code, section 683, or which document so provided; that there was no specific finding as to whether Mary Cordasco signed the signature card before the words "TENANTS IN COMMON" were typed thereon. As hereafter pointed out, the findings are somewhat uncertain but do specifically find that the named parties did open a joint-tenancy savings account, number S33184, on December 4, 1956, in the savings and loan association involved. The evidence would support such a finding. Whether the words "TENANTS IN COMMON" were typed thereon at that time, or whether those words were subsequently placed thereon, was an issue before the trial court, and it did find, at least by inference, that if an attempt was subsequently made to change the account, it was without the consent and knowledge of plaintiff. It then found plaintiff to be the owner of the entire account, apparently by reason of the joint tenancy created by all the instruments and agreements involved and found that defendants had no interest in it.

The principal and sole issue presented by the pleadings was whether the account, number S33184, was a joint-tenancy

account or tenancy-in-common account. The findings sufficiently find on that issue.

█ It is axiomatic that the appellate courts continually uphold judgments in spite of failure to find specifically on a material issue, where there are other more general findings from which the omitted finding follows by necessary implication. (*New* v. *New*, 148 Cal.App.2d 372, 388 [306 P.2d 987].)

█ Neither is it necessary, when a proper finding is made upon an issue, to negate issues contradictory thereto, since the finding on the first issue is an implied negation of all contrary propositions. (*Kux* v. *Cal-West Lumber Corp.*, 162 Cal. App.2d 500, 505 [328 P.2d 240] ; *Brown* v. *Schroeder*, 88 Cal. App. 192 [263 P. 325] ; *Klegman* v. *Moyer*, 91 Cal.App. 333 [266 P. 1009].)

█ Defendants claimed in their answer, as an affirmative defense, that there was a subsequent oral agreement between the parties that the holding of the property should be as tenants in common, and that this agreement having been in existence for more than four years, plaintiff's action was barred by Code of Civil Procedure, section 337. Defendants claim that there was no finding on this claimed defense. It is not apparent how this section is applicable to the facts related. Accordingly, no finding on the claim is necessary.

As a third defense, defendants claim there was some sort of oral agreement between plaintiff and his wife to protect each other's children, and that in accordance with this agreement she drew a will and they opened the account as tenants in common to carry out the terms of the agreement. The general findings sufficiently found against defendants' claim in this respect.

It is next argued that Code of Civil Procedure, section 1962, subdivision 2, in reference to conclusive presumptions, here applies, i.e., that the following is deemed conclusive: "The truth of the facts recited, from the recital in a written instrument between the parties thereto. . . ." Civil Code, section 1651, is also cited. ██ It is the rule that where ambiguity appears in the language used in a written instrument, parol evidence may be used to show the true significance of the language, and notwithstanding the statutory presumption, the court will adopt the more reasonable interpretation. (*Perkins* v. *Maiden*, 57 Cal.App.2d 46 [134 P.2d 30].) See also *Henneberry* v. *Henneberry*, 164 Cal.App.2d 125 [330 P.2d 250].

ESTOPPEL

Lastly, it is argued that the securing by plaintiff's attorney of a consent from the county treasurer on behalf of the state controller to transfer the savings account numbered S33184 in First Federal and the acceptance and transferring of one-half of that amount to plaintiff's account constituted a confirmation that the account stood in their names as tenants in common and that plaintiff should be estopped from claiming the entirety.

The certificate so obtained recites that the estate of Mary Cordasco is involved. After the question, ''Is joint tenancy to be terminated?'' the answer is indicated, ''Yes.'' Written consent is given to transfer to the husband securities, joint accounts, deposits and other assets in his possession or control, belonging to or standing in the name of decedent, of the value of $35,903.46 (the exact amount in the account). Opposite the statement, ''If joint names of said decedent and others appear, gives names'' there follow the names of Pasquale and Mary, with the remark, ''tenants in common.'' It will be remembered that plaintiff presented this certificate to First Federal in an endeavor to transfer all the funds to himself, but First Federal only allowed one-half of that amount to be transferred. We see nothing in the consent to transfer that would operate as an estoppel, as a matter of law, from plaintiff claiming the entirety, particularly where it also recited that a joint tenancy was to be terminated. This was only a fact for the trial court to consider in connection with the main question involved. No special finding on the question of estoppel was required.

Appellants contend that the act of withdrawing one-half of the amount in the account by plaintiff constituted a destruction of the joint tenancy, if one did exist, and therefore the parties held as tenants in common (citing *McDonald* v. *Morley,* 15 Cal.2d 409 [101 P.2d 690, 129 A.L.R. 810]; *Wardlow* v. *Pozzi,* 170 Cal.App.2d 208 [338 P.2d 564], to the effect that any interference with the right of survivorship by the terms of the agreement will sever the joint-tenancy relationship). (See also *Lagar* v. *Erickson,* 13 Cal.App.2d 365 [56 P.2d 1287].)

It should be here pointed out that there was no attempt on the part of plaintiff to destroy the joint-tenancy holding prior to the death of his wife. Title passed to the survivor upon the death of the other joint tenant. (13 Cal.Jur.2d

§ 16, p. 301; *Estate of Harris, supra,* 169 Cal. 725.) We see no merit to this contention.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied May 28, 1962, and appellants' petition for a hearing by the Supreme Court was denied June 27, 1962.